FD-302 (Rev. 5-8-10)

- 1 of 6 -


OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/19/2014

    Robert Stack Beyer II, white male, date of birth ▮▮▮▮▮▮▮ 1971, Social Security Number ▮▮▮▮▮▮, resides at the residence of his girl-friend Maggie Rimel, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Missouri ▮▮. Beyer was contacted by telephone and directed the interviews to meet him at the Kirkwood Public Library, 140 East Jefferson, Kirkwood, Missouri. Beyer was contacted in the computer lab of the library. Beyer was advised as to the identity of the interviewing agents and the nature of the interview. Beyer was advised that he was not under arrest and could end the interview at any time. Beyer said he understood the information provided and wanted to cooperate fully with the interviewers. Beyer provided the following information:

    Beyer attempted to start the Heroic Life Assurance Company (HLA) in the end of 2011 and beginning of 2012. The primary motivation for Beyer to start the company was to offer a life insurance type product that was guaranteed to pay a benefit. Beyer felt persons were not served well by typical life insurance which often never paid a benefit. The product Beyer intended to offer worked in the following way:

    An individual paid the company, in this case HLA, a premium or a number of premiums. The money was held by HLA until the individual died, at which time the money was provided to the policy holder's beneficiary.

    Beyer felt a company selling the product could see a "60% margin". A number of companies in Europe offered similar products and Beyer was attempting to promote the product in the United States. Beyer approached insurance underwriters including Washington National (WN), Kansas City Life (KCL), and the Knights of Columbus (KOC) about the product. WN, KCL, and the KOC seemed interested in the product when talking to Beyer. KCL and KOC were not interested in providing money in HLA. Insurance companies typically invest in real estate and bonds and HLA was not a chartered insurance company.

    Beyer looked to find other investors in HLA. Beyer estimated that it would take $11,000,000 to start the company. Beyer went to a number of persons looking for potential investors. In January 2012 Beyer obtained

---

Investigation on   05/07/2014   at   Kirkwood, Missouri, United States (In Person)

File #   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                  Date drafted   05/14/2014

by   Keith Kohne, COX BILLY C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

about $75,000 from Robin Machnik on a "Promissory Note". The promissory note was provided to Machnik by Beyer. The promissory note was written by an attorney at Beyer's request. Beyer knew Machnik as Beyer had sold Machnik life insurance policies and helped Machnik with investments while Beyer was working for Forsyth Securities (FS). Machnik was not a savvy investor and relied on Beyer for financial advice. Machnik did not understand the terms of the agreement and the risks associated with Beyer using the money to attempt to start HLA. Beyer assured Machnik the money would be safe and Machnik would receive a given rate of return, six or seven percent, on the money she provided. Machnik's previous investment dealings with Beyer at FS likely created a "halo effect" making Machnik believe the money provided to Beyer was being placed in an investment similar to a mutual fund.

Beyer took the money provided by Machnik and opened a business checking account at Meramec Valley Bank (MVB) for HLA. Eventually Beyer had a business checking and a business savings account for HLA at MVB. Beyer also opened a personal account at MVB. Beyer used the money to rent office space for HLA and pay for a number of "business expenses". Beyer felt that it was important to generate interest in HLA to attract additional investors. Beyer began to publicize HLA on the Internet through social media and other web-sites. Beyer bought into the Kauffman Foundation (KF) program. The KF program would allow HLA to provide entrepreneurship classes. The classes were not going to be a money making opportunity, but were more of a "feel good" project which would increase the visibility of HLA and attract additional investors. The classes were to be provided by the Heroic Life Assurance Foundation, which would be non-profit part of HLA.

Beyer was the founder of HLA, took care of the bank accounts of HLA, developed the business plan of HLA, and was the only person who solicited investors for HLA. Beyer decided to pay himself $7,500 per month for his work on HLA.

Beyer hired Stephanie Grimshaw as an administrator for HLA. Beyer agreed to pay Grimshaw $800 per week for her work at HLA. Grimshaw worked almost exclusively on the entrepreneurship classes provided by HLA. Grimshaw was the "number two" person at HLA after Beyer. Beyer created an e-mail account in the name of Jesus Cristobal. Beyer told Grimshaw that Cristobal was a real individual who Beyer was consulting with on a regular basis concerning HLA. Beyer contacted Grimshaw on several occasions as Cristobal, via e-mail. Grimshaw believed Cristobal to be a real individual with an important role at HLA. Beyer listed Cristobal on information posted on the Internet concerning HLA to give HLA a greater appearance of legitimacy. Grimshaw may have met one of the investors in HLA. Grimshaw

Continuation of FD-302 of  Interview of Robert Stack Beyer  , On  05/07/2014 , Page  3 of 6

did not have any access to the bank accounts of HLA. Grimshaw left HLA in the later part of 2012.

Tracy Curtis was a "consulting creative director" at HLA. Beyer paid Curtis for specific projects done by Curtis or expenses incurred by Curtis while working for HLA. Curtis never met with or had any contact with investors in HLA. Curtis did not have any access to the bank accounts of HLA.

Tom Arcaro worked on projects for Beyer at HLA. Beyer paid Arcaro for specific projects done by Arcaro or expenses incurred by Arcaro while working for HLA. Arcaro never met with or had any contact with investors in HLA. Arcaro did not have any access to the bank accounts of HLA. Arcaro assisted Beyer in placing information of the Internet, to include information placed on a Gust.com website. Any information Arcaro placed on the Internet was provided by and/or overseen by Beyer. Arcaro and Beyer worked on a "spreadsheet" to determine the potential profitability of HLA. Based on the "spreadsheet" Beyer determined a 8% dividend would be paid to investors.

In the spring of 2012 Beyer obtained $10,000 from Marilyn Fain in return for Fain obtaining an Associate Membership in HLA. Beyer provided Fain a document specifying the terms of the membership agreement. Part of the membership was to be Fain's receiving an eight percent "dividend", which amounted to an eight percent annual interest on the money she invested. Beyer had previously sold Fain insurance while Beyer was working for another company. Fain was not knowledgeable about financial dealings and was relying on Beyer for financial advice. Beyer assured Fain the money she was investing was safe and she would receive a return on the money she provided.

In March 2012 Beyer obtained $20,000 from Robert Robinson and in May 2012 Beyer obtained $190,000 from Robinson. The money Robinson provided to Beyer had been invested by Robinson in a mutual fund that was not doing well. Robinson was upset the mutual fund was resulting in Robinson loosing some of his principle. Robinson provided the money in return for a membership in HLA which Robinson knew to be a new company. Part of the membership was to be Robinson's receiving an eight percent "dividend", which amounted to an eight percent annual interest on the money he invested. Beyer knew Robinson as Beyer had advised Robinson on life insurance policies and helped Robinson with investments while Beyer was working for Forsyth Securities (FS), including the aforementioned mutual fund. Robinson was not a savvy investor and relied on Beyer for financial advice. Robinson did not understand the terms of the membership and the risks associated with Beyer using the money to attempt to start HLA. Beyer

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Robert Stack Beyer ,On  05/07/2014 ,Page  4 of 6

assured Robinson the money would be safe and Robinson would receive the given rate of return on the money he provided. Robinson's previous investment dealings with Beyer at FS likely created a "halo effect" making Robinson believe the money provided to Beyer was being placed in an investment similar to a mutual fund.

In 2012 Robinson contacted Beyer about getting his divided. Beyer told him the dividend was not guaranteed. Robinson then wanted access to some of his principle as he had bills to pay. Beyer was aware of Robinson obtaining money in the same way from his previous investments. Beyer told Robinson that he could not get his money at the time and would have to wait. Robinson called on a number of occasions and Beyer told Robinson the money was not available. Beyer never told Robinson that his money had been spent.

In or about May 2012 Robin Machnik asked that the money she provided to Beyer in January 2012 be returned. The promissory note provided to Machnik for the money had several deficiencies and Beyer thought it was in the best interest of HLA to return her money. Beyer used some of the money provided by Robinson to reimburse Machnik.

In 2013 Beyer received about $30,000 from Lee Waddington. Waddington provided the money as an investment in HLA. Beyer provided an investment agreement to Waddington that he had copied form a different company. Part of the agreement was to be Waddington's receiving a fixed rate of return. The agreement with Waddington was more of a "banking construct". Beyer had previously sold Waddington insurance while Beyer was working for another company. Waddington allowed Beyer to stay at his residence while Beyer was working in the area. Waddinton was not knowledgeable about financial dealings and was relying on Beyer for financial advice. Beyer assured Waddington the money he was investing was safe and he would receive a return on the money he provided.

Most of the money provided by the investors was used for the salaries paid to Beyer and Grimshaw. Beyer did not complete W-2s or other tax and/or business documents related to HLA because HLA was not really a company at the time and was still more of an "idea". Beyer did not advise the persons providing money as to the status of HLA other than to say things were going good or things were not going well. HLA was going well in the summer of 2012 when Beyer had obtained the names of several "filthy rich" individuals who he had hoped to convince to invest in HLA. At about that time Beyer discovered a "qualified investor" was a person who had at least one million dollars invested in securities and/or had an income of $300,000 a year. Robinson, Waddington, and Machnik did not fit the definition of a qualified investor. Beyer is no longer trying to find

Continuation of FD-302 of  Interview of Robert Stack Beyer  , On  05/07/2014 , Page  5 of 6

further investors in HLA, although he believes the product he was trying to start is going to make a lot of money. The last office Beyer had for HLA was located at 255 Marshall Road, Suite 200, Valley Park, Missouri.

Beyer made about $70,000 in 2010 while working for FS as a broker and selling insurance. In 2011 Beyer only made $20,000 to $30,000. After starting HLA Beyer paid himself about $100,000 from money received from investors. In 2013 Beyer made $5,000 to $10,000 from sources other than HLA. Currently Beyer is living with his girlfriend and is getting money for gas from family members. Beyer has no money and has no current income other than money provided by family and friends. Beyer makes contact with persons through Internet e-mail and Skype. Beyer intends on paying back the persons who invested in HLA through some future business income. Beyer knowingly mislead the investors in HLA telling them their money would be secure when Beyer knew the risks of a startup company. Beyer really believed in the idea of HLA was willing to do anything to make HLA work. Beyer feels bad about misleading the investors as to their money being safe and understands what he did was wrong and could result in his being prosecuted.

In the past Beyer had a bank account at USBank. In 2012 Beyer was using a cellular phone with the number 314-409-8056. Beyer used the phone to contact Machnik, Fein, and Robinson about HLA.

Beyer was with FS, which also did business as Oakbridge, until about May 2012. Beyer surrendered his securities license prior to May 2012. Beyer went back to Oakbridge to sell insurance in or about February 2013. In or about December 2013 Beyer lost his license to sell insurance because he was behind on child support. Beyer was working with Washington National in the fall of 2013 concerning the life assurance product. The deal fell through because of Beyer's suspended insurance license.

Beyer set up account at the Godaddy website, Service@hlac.org", with the password ████████ Beyer was willing to do anything to assist with the investigation to include allowing the agents access to any and all records. Any business records concerning HLA were located in a storage unit Beyer was renting at Uncle Bob's Storage (UBS). Beyer was not current on his payments to UBS and could not access the unit. Beyer said he had no problem with the agents searching the unit and obtaining the records.

Special Agent (SA) Keith Kohne provided Beyer with a Consent to Search form allowing for the search of the Godaddy account Service@hlac.org. SA Kohne read the form aloud as Beyer viewed the form. Beyer indicated he understood the information provided. Beyer signed and dated the form.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Robert Stack Beyer  , On  05/07/2014  , Page  6 of 6